# UNITED STATES DISTRICT COURT

for the

**EASTERN DISTRICT OF WISCONSIN**

In the Matter of the Seizure of

(Address or brief description of property or premises to be seized)

UP TO $115,000 IN FUNDS ON DEPOSIT IN
BMO HARRIS BANK ACCOUNT ENDING IN 0338
HELD IN THE NAME OF DAKOTA INTERTEK

Case Number: 23-849M(NJ)

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

TO: **MICHAEL WARREN, a Special Agent with the United States Department of Housing and Urban Development, Office of Inspector General, and any Authorized Officer of the United States**.

An application by a federal law enforcement officer or an attorney for the government requests that certain property be seized as being subject to forfeiture to the United States of America. The property is described as follows:

Up to $115,000 in funds on deposit in BMO Harris Bank account ending in 0338 held in the name of Dakota Intertek

I find that the affidavit and any recorded testimony establish probable cause to seize the property.

**YOU ARE HEREBY COMMANDED** to search on or before ___February 7___, 2023___
                                                            *(not to exceed 14 days)*

☐ xxin the daytime – 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge Nancy Joseph.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. §2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person, who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days. *(not to exceed 30)*
☐ until, the facts justifying, the later specific date of _____

Date and time issued _1/24___, 2023; 12:30 pm._         *Nancy Joseph*
                                                          *Judge's signature*

City and state: Milwaukee, Wisconsin          THE HONORABLE NANCY JOSEPH
                                              United States Magistrate Judge
                                              *Name & Title of Judicial Officer*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $115,000 IN FUNDS ON DEPOSIT I N
BMO HARRIS BA NK ACCOU NT ENDING IN 0338
HELD IN THE NAME OF DAKOTA I NTERTEK

Case Number: 23-849M(NJ)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Michael Warren, being duly sworn depose and say:

I am a Special Agent with the United States Department of Housing and Urban Development, Office of Inspector General and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, up to $115,000 in funds on deposit in BMO Harris Bank account ending in 0338, held in the name of Dakota Intertek, that is civilly forfeitable under 18 U.S.C. § 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c), as property that consists of, or is traceable to, proceeds of wire fraud committed in violation of 18 U.S.C. § 1343, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

   ✓ Continued on the attached sheet.

   ❑ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Signature of Affiant
Michael Warren, HUD-OIG

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

1/24/2023 @ 12:30 p.m.

at Milwaukee, Wisconsin
City and State

Nancy Joseph, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, MICHAEL WARREN, being first duly sworn on oath, depose and state as follows:

## I. BACKGROUND, TRAINING, AND EXPERIENCE

1.　　I am a Special Agent with the United States Department of Housing and Urban Development, Office of Inspector General ("HUD-OIG"), and have been so employed since February 2010.  Prior to my current position, I served as a sworn police officer for the United States Capitol Police.

2.　　As part of my duties as a HUD-OIG Special Agent, I investigate criminal allegations relating to fraud, false statements, and other violations of federal criminal law.  I have received specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia in conducting criminal investigations, including physical and electronic surveillance, interviewing witnesses, and executing search warrants.  As a Special Agent, I have participated in the execution of multiple federal search warrants and subsequent analyses of evidence seized pursuant to those search warrants.

3.　　HUD-OIG and the Department of Labor-Office of Inspector General (DOL-OIG) conducted an investigation of William K. Cook ("COOK") doing business as BRAXTON ENVIRONMENTAL SERVICES CORPORATION and BRAXTON ECOLOGICAL SERVICES, LLC.

## II. PURPOSE OF AFFIDAVIT

4.　　I make this affidavit in support of an application for a warrant to seize the following property: $115,000 in an account ending in x0338 at BMO Harris Bank, in the name of Dakota Intertek ("Dakota").

5.　　Based on the facts and circumstances set forth below, I submit that there exists

probable cause to believe that the property constitutes or is derived from proceeds traceable to

violations of 18 U.S.C. § 1343 (wire fraud), and is therefore subject to:

    a.       Civil forfeiture under 18 U.S.C. § 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

    b.       Criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c); and

    c.       Seizure via a civil seizure warrant under 18 U.S.C. § 981(b) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

    6.       This affidavit is provided for the limited purpose of establishing probable cause to support the requested seizure warrant. Accordingly, I have not included the details of all aspects of this investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause to believe that the property described above was used or intended to be used to facilitate the crimes listed above.

## III. PROBABLE CAUSE

### A. Background on BRAXTON ENVIRONMENTAL

    7.       Records maintained by the Wisconsin Department of Financial Institutions ("DFI") show that BRAXTON ENVIRONMENTAL was a Wisconsin domestic business corporation established on July 18, 2002, with a principal office at 4300 N. 35th Street, Milwaukee, Wisconsin, and registered agent Bill Cook at 6311 N. 91st Street Milwaukee, WI 53225. DFI records show that BRAXTON ENVIRONMENTAL was administratively dissolved as of September 16, 2017. However, the investigation shows that despite its dissolved corporate status, COOK continued to do business as BRAXTON ENVIRONMENTAL. Records maintained by DFI show BRAXTON ECOLOGICAL was a domestic limited liability company established on September 19, 2011, with a principal office at 1555 S. 113th Street, West Allis, WI 53214.

2

8.      I have reviewed records from the Housing Authority for the City of Milwaukee ("HACM"), which reflect that BRAXTON ENVIRONMENTAL was awarded two subcontracts for demolition work on the Westlawn Revitalization Project, a construction project that received federal funding. The project involved the demolition of existing 1940s-era multiple family housing units and replacing them with new single-family homes. I learned that the project contracts totaled approximately $2.4 million and that the project was funded by HUD, in the form of Choice Neighborhoods Initiative Grants.

9.      As a subcontractor engaged by the general demolition contractor Dakota to do the asbestos abatement portion of the demolition work, BRAXTON ENVIRONMENTAL's share of the project funds totaled approximately $143,000 for contract 17-014, covering asbestos abatement for Phase 2 of the project demolition, and $372,000 for contract 17-047, covering asbestos abatement for Phase 3 of the project demolition, totaling $515,000 in contract funds. COOK executed both subcontracts on behalf of BRAXTON ENVIRONMENTAL. BRAXTON ENVIRONMENTAL performed and was paid for asbestos abatement work on the project from August to October 2017 and from January to March 2018. HACM project managers told investigators that HACM communicated directly with COOK regarding payment, wage, and work hour information.

B.      **Federal Wage Requirements and Applicable Laws**

10.     Contracts for federally-funded public works projects exceeding $2,000 are governed by federal labor laws, in particular, the Davis-Bacon Act. Among the requirements imposed by the Davis-Bacon Act and corresponding regulations is the requirement that contractors pay a "prevailing wage" to their laborers. 40 U.S.C. § 3142(b); 29 C.F.R. Pts. 1 & 3. Due to the nature of the Westlawn Revitalization Project funding, federal Davis-Bacon Act prevailing wage

rates applied, requiring BRAXTON to pay its employees those wage rates for work on the project.

11.     The Department of Labor determines the prevailing wage rates.  Pursuant to 40 U.S.C. § 3142(b), the DOL's wage rate determinations are based on a calculation of the prevailing wages for laborers working on similar projects in the local community and, therefore, typically reflect the wages being paid pursuant to standard union contracts.

12.     To demonstrate compliance with prevailing wage rate requirements, contractors and their subcontractors working on federally funded projects are required to complete and maintain certified payroll records.  Such records include a form (typically, Labor Department Form WH-347 or a derivative thereof) on which the contractor is required to accurately report, on a weekly basis:  (a) the name of each laborer; (b) the daily and weekly number of hours worked by each laborer; (c) their rate of pay; (d) the gross amount they earned; (e) deductions from that gross pay; and (f) net wages paid to each laborer for the week.  29 C.F.R. §§ 3.3(b), 3.4(b), 5.5(a)(3). The contractor's payroll records must be accompanied by a "Statement of Compliance," certifying that the payrolls are correct and complete and that each laborer has been paid not less than the proper prevailing wage for the work performed.  29 C.F.R. § 5.5(a)(3)(ii)(B).

13.     Within seven days of making payment to its laborers, the contractor is required to submit its payroll records to the relevant government agency that is in charge of, or is financing, the construction project.  29 C.F.R. §§ 3.4(a), 5.5(a)(3)(ii)(A).  The contractor is further required to maintain its weekly payroll records for a period of three years from the date of the completion of the contract and to make such records available for inspection by the government contracting officer and the Department of Labor.  29 C.F.R. §§ 3.4(b), 5.5(a)(3).  Additionally, pursuant to Wisconsin Health Department regulation HS 159, environmental demolition subcontractors, such as BRAXTON are required to maintain daily logs reflecting the number of workers present on

4

each work site.

14. Labor Department Form WH-347 contains explicit warnings that the willful falsification of any statements on the form may subject the contractor or subcontractor to criminal prosecution under Title 18 U.S.C. § 1001. *See also* 29 C.F.R. § 5.5(a)(3)(ii)(D) ("[t]he falsification of any of the above certifications may subject the contractor or subcontractor to . . . criminal prosecution under section 1001 of title 18").

15. During my investigation, I determined that during the two phases of asbestos abatement performed by BRAXTON ENVIRONMENTAL workers, COOK did not submit a single certified payroll within the time frame required by HACM and the Department of Labor. Rather, in March 2018 and April 2018, after BRAXTON ENVIRONMENTAL's work on the project was complete, and HACM had begun an investigation based on complaints from BRAXTON ENVIRONMENTAL employees, COOK, using the unique password assigned to him, submitted and certified payroll documents into the web-based LCP tracker system which HACM utilizes for certified payroll submissions. As discussed in further detail below, these certified payroll documents, purportedly documenting employee payroll for both phases of BRAXTON ENVIRONMENTAL's work on the Westlawn project, were incomplete and appeared to contain false information about actual employee wages paid.

C. **Improper Wage Rate Scheme**

16. The evidence gathered to date shows that COOK failed to pay full wages to BRAXTON's laborers and falsified payroll and benefit records, which resulted in the filing of a grievance by the union and a lawsuit by the administrator for the employee pension and welfare funds.

17. As set forth above, BRAXTON ENVIRONMENTAL was subcontracted to

5

conduct asbestos abatement work at existing housing units during the demolition phase two and three of the project. Workers conducting asbestos abatement work at the Westlawn project were required to be classified as either Asbestos Abatement Workers or Asbestos Laborers and were paid a specific wage rate for the hours worked under each classification. HACM's wage rate for both demolition phases required that the Asbestos Abatement Workers removing ductwork and other overhead mechanical systems to be paid an hourly rate $22.35, which consisted of a $17.90 hourly base rate and $4.45 in fringe benefits ("Rate 1"). HACM's wage rate required Asbestos Laborers, preforming removal of non-mechanical asbestos such as tiles, linoleum and caulk, to be paid an hourly rate for Phase 2, of $48.75, which consisted of $30.01 hourly base rate and $18.74 in fringe benefits, and for Phase 3, of $50.23, which consisted of $30.50 hourly base rate and $19.73 in fringe benefits ("Rate 2").

18.     According to Jim Updike, a HACM consultant employed by Professional Services Industries, Inc., ("PSI"), which oversaw the demolition phases of the project, mechanical asbestos demolition primarily involves removal of asbestos wrapped duct work inside walls and selective demolition of said walls. Updike related that the asbestos wrapping around the duct work does not have to be separated, such that once the duct work is removed from the walls, the asbestos wrapping can be disposed with it. He explained that the non-mechanical asbestos demolition is more labor intensive in that it involves the removal of windows, doors and floor tile and the scraping and removal of caulking material. Based on the age of the Westlawn buildings as well as their size and construction, Updike opined that approximately 70-75% of the asbestos demolition work on the Westlawn project was non-mechanical (requiring that laborers be paid at Rate 2) and that 25-30 % of the work was mechanical (requiring laborers be paid at Rate 1).

19.     Starting in January 2018, during Phase 3 of the demolition project, HACM received

6

multiple complaints from BRAXTON ENVIRONMENTAL employees who stated that they were not paid the required higher wage rate (Rate 2) for the amount of time they spent conducting non-mechanical asbestos abatement. Several of these employees provided copies of pay stubs that they received from BRAXTON ENVIRONMENTAL in connection with their paychecks.

20. In response to the employee complaints, HACM undertook an investigation and referred the matter for investigation by HUD-OIG and DOL-OIG. As part of the HACM investigation, COOK was directed to produce documents, to include payroll records proving payments and payment amounts, workplace logs, time sheets, and employee lists. As noted above, on federally funded projects, contractors are required to maintain weekly payroll records for a period of three years from the date of the completion of the contract, and to make those records available for inspection by the government contracting officer (here HACM) and the Department of Labor. During my investigation, HACM provided me with copies of those documents that COOK produced. I observed that the production was incomplete. It included no records for demolition Phase 2, except for the certified payroll documents that COOK uploaded into the LCP tracker in March 2018. As to Phase 3, the production included incomplete employee worksite logs, and copies of payroll records that do not match the records that COOK uploaded into the LCP tracker system in April 2018.

21. During my investigation, I also caused a grand jury subpoena to be issued to BRAXTON ENVIRONMENTAL for project records, to include payroll information. In early 2019, after several months of delay, COOK produced a thumb drive purporting to contain the requested documents. Like COOK's production to HACM, the documents were incomplete. There were no pay documents or sign-in sheets for Phase 2 of the project. For Phase 3, there were sign-in sheets reflecting total daily employee hours with no breakdown of the number of those hours

7

spent in Rate 1 versus Rate 2 work. There were also paystubs that purported to reflect the total number of hours that the employees spent in Rate 1 versus Rate 2 work during phase 3, but no supporting documents to show the basis for those numbers.

22.     As part of my investigation, I also obtained records from BRAXTON ENVIRONMENTAL's business account at J.P. Morgan Chase Bank. Those records show that BRAXTON ENVIRONMENTAL received and deposited into its business account checks issued by general contractor Dakota, for BRAXTON ENVIRONMENTAL's abatement work on the Westlawn project. The records also show that COOK's wife, who is the sole signer on the BRAXTON ENVIRONMENTAL business account, transferred funds into a then new business account that the COOKS had opened in July 2017 at North Shore Bank in the name of BRAXTON ECOLOGICAL.  I also obtained the North Shore bank records, which reflect that COOK's wife issued payroll checks from that account to the BRAXTON employees who worked on the Westlawn project.  The amounts of the checks match the amounts on the paystubs that COOK produced to HACM and employees produced to investigators, but do not match the amounts on the certified payrolls that COOK uploaded into the LCP tracker in March and April 2018. Additionally, both the pay stubs and the certified payrolls appear to far understate the amount of wages that the employees were entitled to receive on the Westlawn project under federal prevailing wage rates.

23.     As part of my investigation, I conducted an analysis of the various pay documents, including the paystubs produced by the employees, the paystubs that COOK did produce to HACM and the government, and the certified payroll submitted through LCP tracker. This analysis indicates that where BRAXTON ENVIRONMENTAL workers should have received Rate 2 during Phase 2 for approximately 70-75% of their work hours (according to PSI), it appears that

8

they only received wage Rate 2 approximately 12% of the time; and, where they should have received Rate 2 during Phase 3 for approximately 70-75% of their work hours (according to PSI), it appears that they only received Rate 2 for approximately 19% of those hours. I also compared BRAXTON's certified payrolls submitted through LCP Tracker with the certified payrolls of two other abatement subcontractors who performed substantially similar demolition work on demolition Phases 1 and 4 of the Westlawn project. These two other abetment subcontractor's workers received Rate 2 approximately 60% to 61% of the time as compared to Braxton's workers who only received Rate 2 approximately 12% and 19% for Phases 2 and 3, respectively.

24. Additionally, while BRAXTON ENVIRONMENTAL employees asserted, and records provided by the environmental oversight consultant PSI confirmed, that the employees performed abatement work on several weekends during the project, the certified payrolls provided to HACM by BRAXTON ENVIRONMENTAL indicate that at no point during Phase 2 or Phase 3 of the Westlawn demolition contracts did BRAXTON ENVIRONMENTAL pay employees any overtime payment or pay them for any work conducted on the weekends.

25. I have personally interviewed or reviewed reports of interviews conducted with five employees who worked for BRAXTON ENVIRONMENTAL on one or both phases of BRAXTON ENVIRONMENTAL's demolition work on the Westlawn project. All five reported that the majority of their work consisted of activity that was non-mechanical, that is, they described work that required payment of the higher Rate 2 wage, but they told investigators that they were actually paid at the lower rate. One employee related that COOK advised him that COOK was aware of the required prevailing wage rate and that he wouldn't pay it, but instead, would provide the employees with meals and a bonus payment.

26. In December 2018, after opening the federal investigation, I interviewed COOK.

9

The main purpose of the interview was to contact him about his failure to respond to the grand jury subpoena for BRAXTON ENVIRONMENTAL's project records. During the interview COOK stated, among other things, that he had already provided documents to HACM, including cancelled checks, work logs, check statements from employees, project summaries, and closeout paperwork. After this interview, COOK produced a thumb drive that purported to have the information required by the grand jury subpoena. As noted above, both COOK's production to HACM and his production in response to the grand jury subpoena were incomplete and failed to include documents that he was required by law to maintain.

### D.    HACM Investigation

27.    HACM directed the general contractor Dakota to withhold $115,000 in funds due to BRAXTON ENVIRONMENTAL for the work conducted on Phase 2 and Phase 3 of the Westlawn project. After an investigation based on the records available to it at the time, HACM concluded that BRAXTON ENVIRONMENTAL had underpaid employees by approximately $36,180.76 for the two phases of the project and continued to direct Dakota to withhold the funds until the issue of underpayment to the employees was resolved.

28.    After HACM's report of findings was issued, COOK submitted an appeal, arguing that his wage payments were correct because he had discovered and used a unique time and labor-saving process that reduced the amount of time required to perform the non-mechanical work. The case was referred to HUD-OIG and DOL OIG for criminal investigation and the appeal did not advance. Based on a review of bank records and other materials described herein, investigating agents at HUD-OIG and DOL-OIG have determined that the underpayment was approximately $116,990.86 (based on a calculation of 70% mechanical v. 30% non-mechanical work). Dakota confirmed that it continued to hold the funds, as directed by HACM, and as of January 23, 2023,

10

the funds are currently in the account described above at BMO Harris Bank.

### E. Criminal Proceedings

28.     On August 25, 2020, a grand jury in the Eastern District of Wisconsin returned an indictment charging COOK with four counts of wire fraud, in violation of 18 U.S.C. § 1343.  On July 27, 2021, a grand jury returned a superseding indictment charging COOK with four counts of wire fraud, in violation of 18 U.S.C. § 1343, and adding a forfeiture notice.  On July 18, 2022, the Court granted the government's motion to dismiss the superseding indictment without prejudice.

29.     On various dates in August 2022 through January 2023, COOK contacted HACM, Dakota, the U.S. Attorney's Office, and the district court seeking the $115,000 in funds.

### F. State Tax Levy

30.     On July 20, 2020, the State of Wisconsin, Department of Revenue, notified Dakota of a tax levy against Bill and Debbie Cook, Braxton Environmental Service Corp., in the approximate amount of $156,351.  The government's intent is to take custody of the funds, pursue civil forfeiture, and provide notice to the State in the forfeiture proceeding so that it can decide whether to an assert an interest in the funds.

## IV.  CONCLUSION

31.     Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that the property – $115,000 in an account ending in x0338 at BMO Harris Bank, in the name of Dakota – constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud), and a protective order would not be sufficient to assure the availability of the property for forfeiture.  As such, the property is subject to:

   a.     Civil forfeiture under 18 U.S.C. § 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

11

b.      Criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c); and

c.      Seizure via a civil seizure warrant under 18 U.S.C. § 981(b) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

12